

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-30-2004

# USA v. Grass

Precedential or Non-Precedential: Non-Precedential

Docket No. 02-2994

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"USA v. Grass" (2004). *2004 Decisions.* Paper 904.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/904

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

_____

NO. 02-2994
_____

UNITED STATES OF AMERICA

v.

NICHOLAS GRASS
a/k/a
NICKY GRASSO

Nicholas Grass,
Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Crim. No. 00-cr-00120-1)
District Judge: Hon. Eduardo C. Robreno

_____

Submitted Under Third Circuit LAR 34.1(a)
March 8, 2004

Before: SLOVITER, NYGAARD, Circuit Judges and OBERDORFER, District Judge*

(Filed: March 30, 2004)

_____

OPINION OF THE COURT

_____

* Hon. Louis F. Oberdorfer, United States District Court for the District of
Columbia, sitting by designation.

SLOVITER, Circuit Judge.

Nicholas C. Grass appeals from the judgment of conviction and the resulting sentence stemming from drug conspiracy and obstruction of justice charges against him. For the following reasons, we will affirm.

I.
Factual Background and Procedural History

Because we write solely for the parties, we limit our discussion of the background facts to only those relevant to the issues on appeal. In October 1998, Grass purchased five pounds of methamphetamine from Jay Haefele, who headed a drug manufacturing ring. Payment of $50,000 was to be by installments. To facilitate Grass' processing and distribution of the methamphetamine, Haefele supplied Grass with five pounds of dilutant or "cut" at no additional charge. Grass, who had completed his payments, purchased in March 1999 an additional five pounds of methamphetamine from Haefele, under the same conditions. Although a small amount of the drug from this second purchase was eventually reclaimed and resold by Haefele, Grass retained possession of the majority of this supply.

Haefele was arrested in July 1999 by agents of the Drug Enforcement Agency ("DEA") and began cooperating with the Government. With Haefele's cooperation, DEA agents observed a number of his conversations that detailed the nature and depth of the distribution conspiracy. On August 20, 1999, Haefele met with Grass and informed him that he needed the money owed by Grass for attorney's fees. Grass subsequently made

2

two installment payments due on his second methamphetamine purchase to Charles McKee, one of Haefele's partners, who then transferred the money to Haefele. Grass also expressed interest to McKee in purchasing additional methamphetamine for distribution. Because the other members of the conspiracy began to be indicted in February of 2000, this transaction was never consummated.

McKee was indicted on February 9, 2000 for his participation in the conspiracy to distribute phenyl-2-propanone, and produce and distribute methamphetamine. On February 10, 2000, Grass was charged by complaint with conspiracy to distribute, and possess with intent to distribute, ten pounds of methamphetamine in violation of 21 U.S.C. § 846. Grass was later indicted on one count for the same offense.

In order to undermine the Government's methamphetamine conspiracy case against him, Grass sent his friend, Richard Marshall, to meet McKee who had already begun cooperating with the Government. Through a series of meetings, Marshall and McKee devised a plan whereby McKee would write a false suicide note stating that Grass had nothing to do with the methamphetamine conspiracy. In exchange for this note, McKee would be provided with cash to flee the jurisdiction so that he could not testify. DEA agents observed and recorded these meetings.

At some point while these meetings were taking place, Marshall told one of Grass' initial defense counsel, John J. Fioravanti, that he could obtain evidence that exculpated Grass from the methamphetamine conspiracy. Fioravanti encouraged Marshall to obtain

3

the evidence, not knowing that the evidence was a "sham" suicide note from one of Grass' co-conspirators. McKee then sent the note to Grass' other defense attorney, Guy R. Sciolla, even though the letter was addressed to McKee's own attorney.

On August 16, 2000, the grand jury returned a superseding indictment against Grass, adding to the original conspiracy charge a charge of obstruction of justice in violation of 18 U.S.C. § 1503. Grass pled not guilty to the charges in the superseding indictment.

On October 4, 2000, the Government filed a motion to disqualify Fioravanti and Sciolla as Grass' attorneys and the District Court, after a hearing, granted the motion. On December 12, 2000, Grass retained F. Emmet Fitzpatrick, Jr., to represent him at trial.

Three incidents at trial are at issue in this appeal. First, a government witness testified about previous marijuana sales to Grass. Defense counsel objected and moved for a mistrial. The District Court denied the mistrial motion but sustained the objection to the admission of the testimony. Second, Marshall falsely testified on cross-examination that he had not paid McKee for the purpose of assisting his efforts to be unavailable for Grass' trial. Third, during jury deliberation a draft copy of unapproved jury instructions found its way into the jury deliberation room. This error was apparently discovered after the jury had already reached its verdict with respect to the conspiracy charge, drug quantity, and forfeiture. The trial judge questioned the jury about these unapproved instructions, and concluded that Grass was not prejudiced by this error.

4

The jury returned a guilty verdict against Grass on both the conspiracy and the obstruction of justice counts, finding that the conspiracy to distribute and to possess with intent to distribute methamphetamine involved a quantity of 500 grams or more. The jury also determined that Grass should forfeit $49,900 to the Government. On post-trial motions, the District Court denied Grass' motion for acquittal, but granted its motion for a new trial with respect to the conspiracy charge. The court concluded that it was "highly probable" that Haefele's testimony concerning Grass' prior marijuana purchases tainted the jury's judgment in deciding on the methamphetamine conspiracy charge. The court refused to grant a new trial with respect to the obstruction of justice count, however, "because the obstruction of justice count involved different evidence and different witnesses." App. at 46 n.10.

Grass was found guilty on the retrial, and the jury later found that he was involved in the distribution of 500 or more grams of methamphetamine.

The court sentenced Grass to 204 months imprisonment on the methamphetamine conspiracy count and a concurrent sentence of 120 months on the obstruction of justice count, followed by five years supervised release, a $5,000 fine, a $200 special assessment and $49,900 in forfeiture to the Government. Grass timely appealed. The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction over the appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

II.

Discussion

A.    Whether the Evidence Was Sufficient to Support Grass' Conviction For
      Conspiracy to Possess and Distribute Methamphetamine.

Grass argues that the evidence presented by the Government was insufficient to

support his conviction for conspiracy to distribute methamphetamine because the

evidence presented at trial demonstrated that he was "at most . . . a customer of the

McKee/Haefele conspiracy."  Appellant's Br. at 25.

In order to satisfy its burden of proof on a conspiracy conviction, the Government

must establish "a unity of purpose between the alleged conspirators, an intent to achieve a

common goal, and an agreement to work together toward that goal."  United States v.

Gibbs, 190 F.3d 188, 197 (3d Cir. 1999).  While isolated evidence demonstrating an

individual's involvement in either buying or selling drugs may be insufficient to support a

drug conspiracy conviction, "'even an occasional supplier [or buyer] can be shown to be a

member of the conspiracy by evidence, direct or inferential, of knowledge that she or he

was part of a larger operation.'"  United States v. Perez, 280 F.3d 318, 343 (3d Cir. 2002)

(quoting United States v. Price, 13 F.3d 711, 728 (3d Cir. 1994)).

Where a defendant's involvement in an alleged drug conspiracy is limited to drug

purchases, we have,

> looked to the surrounding circumstances to determine whether the
> defendant is a mere buyer who had such limited dealings with the
> conspiracy that he cannot be held to be a conspirator, or whether he has
> knowledge of the conspiracy to the extent that his drug purchases are

6

circumstantial evidence of his intent to join that conspiracy.

Gibbs, 190 F.3d at 199.

"It is not for [an appellate court] to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." United States v. Schramm, 75 F.3d 156, 159 (3d Cir. 1996) (internal quotation and citation omitted). The Government's evidence at trial was sufficient to support Grass' conviction. Grass was not only aware of the overall operation of the conspiracy, but he was also intricately involved in furthering its goal of methamphetamine distribution. The evidence established that Grass made two purchases of methamphetamine, and was interested in a third. The systematic nature of these transactions demonstrates that Grass had developed an established relationship with the conspiracy.

In addition, Grass received assistance from the conspiracy in the form of free "cut," or dilutant, in order to promote his efforts. This assistance from Haefele and other members of the conspiracy demonstrates that Grass was engaged with them in a cooperative relationship of methamphetamine distribution.

Finally, the conditions of Grass' drug purchases demonstrates his awareness of, and involvement in, the conspiracy. Grass purchased methamphetamine from the conspiracy entirely on credit, making periodic payments to satisfy the credit. The parties were thus operating under a relationship of trust and mutual benefit. The fact that Grass

7

made two large purchases of methamphetamine totaling ten pounds – a significant quantity of narcotics – also demonstrates that Grass was more akin to a distributor for the conspiracy than an isolated purchaser.

Grass argues that his refusal to sell a portion of his methamphetamine supply to Jill Cohen, another drug purchaser, demonstrates that he was not sufficiently involved with the conspiracy to support his conviction. Haefele subsequently reclaimed two pounds of methamphetamine from Grass' supply and sold it directly to Cohen. Grass argues that the incident demonstrates that he was not "voluntarily part of a larger operation." Appellant's Br. at 19. The Government counters that these facts demonstrate that "Grass knew there was an organized effort among several people to redistribute methamphetamine, and he knowingly participated over an extended period of time." Appellee's Br. at 37 n.4.

Given that the overall context as well as the conditions of the transactions demonstrate that Grass worked together with the conspiracy in a manner that demonstrates the requisite "unity of purpose," the evidence was sufficient to support Grass' conviction for conspiracy to distribute methamphetamine.

B.      Whether Grass was Deprived of Sixth Amendment Right to Counsel When the District Court Disqualified his Chosen Attorneys

We review a district court's order disqualifying a defendant's chosen counsel under a two stage inquiry. "First, we exercise plenary review to determine whether the district court's disqualification was arbitrary – the product of a failure to balance the

proper considerations of judicial administration against the right to counsel." United

States v. Merlino, 349 F.3d 144, 150 (3d Cir. 2003) (quoting United States v. Stewart,

185 F.3d 112, 120 (3d Cir. 1999) (internal quotation and citation omitted)).  If the district

court's decision was not arbitrary, we must determine whether the court abused its

discretion in disqualifying the attorney.  Id.

A district court's decision to disqualify a defendant's chosen counsel is not

arbitrary if the record was sufficient "to enable the district court to make a reasoned and

well-informed decision."  United States v. Voigt, 89 F.3d 1050, 1076 (3d Cir. 1996); see

also Merlino, 349 F.3d at 150.  The District Court reached its decision after a thorough

examination of the underlying facts.  The District Court not only held a hearing to address

the motion for disqualification, at which the facts related to the counsel's involvement

with the "sham" suicide note were undisputed, but also issued a detailed opinion that

explained why the interests of proper administration and justice outweighed defendant's

Sixth Amendment right to his chosen counsel.  The decision, therefore, was not arbitrary.

Nor was there an abuse of discretion.  The Supreme Court has held that a district court,

> must recognize a presumption in favor of petitioner's counsel
> of choice, but that presumption may be overcome not only by
> a demonstration of actual conflict but by a showing of serious
> potential for conflict. The evaluation of the facts and
> circumstances of each case under this standard must be left
> primarily to the informed judgment of the trial court.

Wheat v. United States, 486 U.S. 153, 164 (1988).  Because it is generally impermissible

for counsel to be both a witness and an advocate, Gov't of Virgin Islands v. Zepp, 748

9

F.2d 125, 138-39 (3d Cir. 1984), the potential that counsel may be called as a witness is a relevant consideration to be weighed in determining whether disqualification is appropriate. We also recently held that "disqualification may also be appropriate where it is based solely on a lawyer's personal knowledge of events likely to be presented at trial, even if the lawyer is unlikely to be called as a witness." <u>Merlino</u>, 349 F.3d at 152.

Here, the District Court properly determined that the potential for conflicts outweighed Grass' Sixth Amendment rights. The District Court's decision to disqualify Grass' original counsel, Fioravanti and Sciolla, arose out of their involvement in the facts surrounding the obstruction of justice charge. Fioravanti allegedly encouraged Marshall to obtain exculpatory evidence, not knowing that it was a "sham" suicide note from one of Grass' co-conspirators. Sciolla then received in the mail the "sham" suicide note which purported to exculpate Grass from the underlying drug charges. Such personal involvement, however unwitting, is sufficient ground for their disqualification.

We reject Grass' argument that the District Court abused its discretion by refusing to accept his waiver of any potential conflicts of interest that may have arisen through the representation by original defense counsel. The Supreme Court has stated:

> . . . a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials. . . .

10

> For these reasons we think the district court must be allowed substantial latitude in refusing waivers of conflicts of interest . . . in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses.

Wheat, 486 U.S. at 162-63. In denying Grass' attempted waiver, the District Court noted that granting the waiver would raise serious concerns not only about defense counsel's ability to vigorously defend their client, but also about the public's confidence in the administration of justice. This constitutes sufficient ground, under Wheat, for the District Court to refuse to grant a waiver, and its decision was not an abuse of discretion.

In short, Grass was not deprived of his Sixth Amendment right to counsel because of the District Court's decision to disqualify Fioravanti and Sciolla as defense counsel.

C.      Whether the District Court Properly Ruled that Grass was not Prejudiced by the Mistaken Delivery of a Draft Copy of the Jury Instructions During Deliberations.

We review for abuse of discretion both the denial of a defendant's motion for a new trial based on the introduction of extraneous information, and the district court's finding that the defendant failed to demonstrate substantial prejudice from the introduction of the information. United States v. Lloyd, 269 F.3d 228, 237 (3d Cir. 2001).

Grass argues that he was substantially prejudiced by the jury's possession of a draft copy of jury instructions during deliberations. We must conduct "an objective analysis by considering the probable effect of the allegedly prejudicial information on a hypothetical average juror." United States v. Gilsenan, 949 F.2d 90, 95 (3d Cir. 1991).

11

Grass argues that because the draft instructions included a footnote citing a case criticizing the "hesitate to act" portion of the jury instruction concerning reasonable doubt, a hypothetical juror would believe that the District Court's definition of reasonable doubt was controversial. It appears improbable, however, that the presence of this footnote would cause the average hypothetical juror to disregard the Government's burden to prove Grass' guilt beyond a reasonable doubt. The reference to character evidence in the draft jury instructions also did not prejudice Grass, as that reference was crossed out with an "X" in the margin.

Finally, language in the draft instructions that would only be given in the event that the jury first found Grass guilty of the conspiracy charge did not prejudice Grass because these types of instructions are frequently given in criminal trials, where the jury must find guilt on one aspect of the case before proceeding to another. It is unlikely that a juror would act in a manner so inconsistent with accepted criminal practice. The District Court's decision not to grant a new trial on the obstruction of justice charge was not an abuse of discretion.

D.    Whether the District Court Properly Determined that the Mistaken Introduction of Evidence Concerning Uncharged Marijuana Purchases was not Grounds for a New Trial on the Obstruction of Justice Charge.

Grass contends that the District Court erred in refusing to grant a new trial because of the brief mention of his involvement in prior marijuana purchases during the examination of a witness. The drug at issue here was methamphetamine, not marijuana.

12

Haefele's mention of Grass' prior marijuana sales during Grass' first trial was an isolated reference that was quickly stricken from the record, and the court provided a strict cautionary instruction to the jury to disregard the testimony. We have frequently stated that "a jury is presumed to follow the instructions that the court gave it." United States v. Givan, 320 F.3d 452, 462 (3d Cir. 2003). In United States v. Hakim, 344 F.3d 324, 325-26 (3d Cir. 2003), we concluded that the district court did not err in response to a witness' reference to the defendant smoking crack, because the court struck the testimony and gave a proper cautionary instruction. Id. The District Court's willingness to grant a retrial on the drug conspiracy charge demonstrates that it was not foreclosed to the possibility of prejudice resulting from the introduction of this evidence. The court carefully considered the consequences of this evidence on the obstruction of justice charge and concluded that a retrial on the other count was not appropriate. There was no error or abuse of discretion.

E.      Whether the Sentence Imposed by the District Court was Proper.

Grass argues that the court's sentence violates the Supreme Court's holding in Apprendi v. New Jersey, 530 U.S. 466 (2000). This Court "exercise[s] plenary review over . . . the possible 5th and 6th Amendment constitutional implications, of [a] sentence under Apprendi." United States v. Parmelee, 319 F.3d 583, 590 (3d Cir. 2003). Because Grass mis-characterizes the reach of Apprendi, however, his argument is without merit.

The relevant statute provides that "[a]ny person who . . . conspires to commit any

13

offense defined in this subchapter, shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the . . . conspiracy." 21 U.S.C. § 846. A conviction for "50 grams or more of methamphetamine . . . or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine" carries a sentence no "less than 10 years or more than life." 21 U.S.C. § 841(b)(1)(A)(viii); see also United States v. Gori, 324 F.3d 234, 236 (3d Cir. 2003). Under the jury's finding that Grass was guilty of an offense involving more than 500 grams of methamphetamine, Grass' 204 months sentence, less than the maximum of life imprisonment, was appropriate.

Grass argues that "jury's verdict supported a sentence of no more than 188 months – the top of the guideline range for an offense involving no more than 500 grams of methamphetamine." Appellant's Reply Br. at 19. Armed with a jury verdict finding Grass guilty of conspiracy to possess and distribute 500 grams or more of methamphetamine, however, the District Court was authorized to impose a sentence up to the applicable maximum, which is life imprisonment. For the foregoing reasons, we will affirm the District Court's judgment of conviction and sentence.

_____